IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:06-CR-5 |
| V. | ) | (Phillips / Shirley) |
| | ) | |
| DAMION BRADLEY JACKSON, | ) | |
| | ) | |
| Defendant. | ) | |

### **REPORT AND RECOMMENDATION**

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition, or report and recommendation regarding disposition, by the District Court as may be appropriate. This matter came before the Court on April 19, 2007, for an evidentiary hearing on defendant Damion Jackson's Motion to Suppress [Doc. 44]. Mr. Jackson was present in the courtroom along with his attorney, James Varner. Assistant United States Attorney Tracee Plowell was present on behalf of the government. The Court received testimony from Knoxville Police Department Sergeant Travis Brasfield and received one exhibit into evidence; arguments were made by Attorney Varner and AUSA Plowell. Given the importance of the factual details of the automobile stop to this motion to suppress, and the importance of accuracy, counsel asked for time to review the transcript of the hearing and file post-hearing briefs. The Court granted leave to file post-hearing briefs. Defendant Jackson filed a post-hearing brief on May 18, 2007; the government responded on May 31, 2007. After receiving briefs of the parties, the Court took this matter under advisement on June 1, 2007. The record before the Court is as follows.[1]

---
[1] The transcript of this hearing was filed with the clerk of the court on April 25, 2007, as [Doc. 54].

## A. FACTS

Just before midnight on May 12, 2005, the Knoxville Police Department performed a traffic stop on a black Chevrolet Caprice driven by Damion Jackson. That stop led to his arrest and ultimately to the instant indictment charging Mr. Jackson and his passenger with possession of five grams or more of crack cocaine with the intent to distribute it and with carrying a firearm during the commission of that offense. Mr. Jackson was additionally charged with being a felon in possession of a firearm. The government later dismissed the charges against the passenger.

The government called one witness at the evidentiary hearing: Knoxville Police Department Sergeant Travis Brasfield. Officer Brasfield testified that he is a patrol sergeant with the city police department, having held that rank for four months. On May 12, 2005, at the time he stopped and arrested Damion Jackson, Officer Brasfield was assigned to the West District Patrol Community Response Team, a unit charged with addressing "specific complaints on property crimes and drug complaints." (Tr. 6).

On May 12, 2005, Officer Brasfield was working from 8:00 p.m. to 4:00 a.m. in a uniformed patrol vehicle; he was accompanied by two partners both in different patrol cars. (Tr. 7, 9). The officers were on a specific duty that night: "Captain Price with the Organized Crime Unit had given us a drug complaint at the Pines Apartments." (Tr. 7). Officer Brasfield testified that the Knoxville Police Department receives a large number of calls for service at the Pines Apartments complex. (Tr. 8). His description suggested that it would be fair to characterize the Pines Apartments as a high crime area. Officer Brasfield testified that he has made a thousand arrests during his career in law enforcement, about ten percent of these have been related to drugs. (Tr. 8).

Officer Brasfield testified that on May 12, 2005, he was in a marked police cruiser equipped with audio and video recording capability. At about 11:50 p.m., he was parked "in the subdivision across from the Pines, Grenoble Drive." (Tr. 9). Officer Brasfield testified that Officer Blevins was in an unmarked car in plain clothes in front of an apartment that had been the subject of a drug complaint. (Tr. 9). This apartment complex is an area that receives a large volume of calls for a wide range of assistance from the police, to include reports of domestic violence, complaints about drugs, disturbances, and suspicious persons. (Tr. 8, 9). Officer Blevins was communicating descriptions and violations of people and vehicles coming and going from the apartment. Officer Brasfield recalled, "We were across the way and we were to stop those folks." (Tr. 10). As to the stop at issue, Officer Brasfield testified:

> A. He [Blevins] called in the black Caprice as one of the occupants going into the apartment. Said it had a loud muffler and it was coming out [from the parking lot]. Boatman and I were sitting together across the road. We heard the pipes on the car. It was pretty loud coming out of the neighborhood. I slid up to the end of the street. When I saw the black Caprice pass going toward Helmbolt, I pulled out and caught up to him.
>
> Q. Tell the Court what you observed.
>
> A. When I topped the hill coming down toward Helmbolt, I noticed the black Caprice turning left onto Helmbolt from Francis and didn't signal while turning and didn't come to a complete stop at the stop sign.
>
> (Tr. 10)

Officer Brasfield went on to testify, and the videotape record of his conversation confirmed, that he observed the defendant fail to stop at the stop sign and also fail to signal the turn. He further testified that he made the traffic stop because the defendant ran the stop sign and did not signal. (Tr. 22, 32, 34-35, 46). When he stopped the Caprice, he noticed that the car did not have any exterior

mirrors and that the windows on the car were tinted dark "to the point I couldn't see inside the vehicle even using my spotlight." (Tr. 11). Officer Brasfield then used his PA system to communicate to the driver to turn the car off and "step back to my vehicle." (Tr. 11). On the videotape, Officer Brasfield advised Mr. Jackson he had stopped him for running the stop sign and not signaling his left turn. Officer Brasfield then testified that he then asked for the defendant's driver license. The defendant, Damion Jackson, told Officer Brasfield that he didn't have a license because it was suspended. (Tr. 11, 56-57). Officer Brasfield testified that he then handcuffed Mr. Jackson and put him into the backseat of his cruiser. Officer Brasfield testified, "I got his personal information; ran him on records. While I was writing out the tickets that I was giving him for the traffic violations, Records came back and said he had an active warrant from the Sheriff's Office for assault." (Tr. 11).

Officer Brasfield testified that "during all this," Officer Boatman arrived at the scene of the stop. (Tr. 12) Officer Boatman "went up to the car to check where he was sitting. He found some contraband in the car." (Tr. 12).

Officer Brasfield testified that there was a woman in the Caprice, along with a small child and a pit bull dog. (Tr. 12). The woman, Lashondra Brooks, "got the child out and came back to the car with me. Boatman found some crack and a gun in the car with some ammo…" Then the woman told Officer Brasfield that she was carrying a concealed weapon in her purse. Ms Brooks asserted that she had "papers" on the gun and that it was legal to carry. This later turned out to be inaccurate. (Tr. 13).

At this point in Officer Brasfield's testimony, the government introduced into evidence the video recording made by his in-cruiser camera during this series of events. Exhibit 1. Officer

4

Brasfield identified the VHS videotape as a "copy of the tape from that night with me on it." (Tr. 14). AUSA Plowell played the videotape during the hearing and Officer Brasfield provided some narration.

On cross examination, Officer Brasfield testified that he was parked at the entrance to Grenoble Drive, across from the Pine Apartments, in view of Francis Street. (Tr. 26). Officer Brasfield testified that he did not remember whether the officer who initially reported the Caprice gave a license number. (Tr. 27) Officer Brasfield agreed that the hill approaching the intersection of Francis and Helmbolt is a "steep grade" and that the subject vehicle had already topped the hill "and was down quite a ways from" the officer when he topped the hill. (Tr. 27). He estimated the distance from the top of the hill to the stop sign at the intersection to be 500 to 800 feet.[2] (Tr. 28). Officer Brasfield, however, testified that his actual line of sight to the defendant's vehicle, as he crested the hill, was different from that of the cruiser camera, and that he could see the defendant's car prior to it going through the stop sign. (Tr. 28).

Officer Brasfield testified that there are two intersecting roads leading into Francis Road along the route he first followed the Caprice, to the stop sign at Helmbolt. (Tr. 29). After the defendant turned onto Helmbolt, Officer Brasfield testified there were two intersecting roadways, but he did not know how many driveways existed between the Francis Road and Helmbolt intersection and where he next came upon the defendant's vehicle. Nor did he know how many cars may have turned onto or from these roadways during the time he lost sight of the Caprice after it turned onto Helmbolt. (Tr. 30). Officer Brasfield testified that he did not have with him a field test kit for window tint at the time he stopped Mr. Jackson. (Tr. 32). Officer Brasfield testified there

---

[2] Investigator Jim Murray testified later that he measured the actual distance at .2 mile. (Tr. 62)

5

was little to no traffic on the road at the time of these events, although there were other cars on the road. (Tr. 33). He testified that Mr. Jackson told him that his driver license was suspended immediately upon contact, in response to an inquiry. (Tr. 34). Officer Brasfield explained that he did observe that the Caprice had no external mirror on the driver's side before the stop. He testified that he noticed the lack of a mirror at the intersection of Helmbolt and Piney Grove because the officer was attempting to shine his cruiser spotlight into the mirror to blind the driver. (Tr. 36).

Officer Brasfield did respond to a question as to whether he knew how long the vehicle had been at the stop sign by stating that he did not know. (Tr. 38). However, Officer Brasfield testified repeatedly that he saw the defendant's vehicle prior to the stop sign (Tr. 28) and he observed the defendant run through the stop sign (Tr. 10, 15, 42 and 56) and that he stopped the defendant's vehicle for running the stop sign (Tr. 22, 32, 34-35, 46).

Officer Brasfield testified that he can easily recognized a Chevrolet Caprice tail light because he drove the same model for his first patrol car. (Tr. 38). Officer Brasfield testified that there were no other vehicles around to be affected by Mr. Jackson's failure to signal the left turn from Francis onto Helmbolt. (Tr. 43). Officer Brasfield agreed that from the time he crested the hill on Francis and saw the defendant approaching the stop sign (at 23:46:51 on the videotape) he lost contact with the subject vehicle after it turned left onto Helmbolt for 41 seconds until he had it in his sight again, and caught up to it. (Tr. 45).

At the conclusion of Officer Brasfield's testimony, the government rested. The defense called one witness, Jim Murray, a Tennessee licensed private investigator since 2004. (Tr. 60). Mr. Murray testified that he was with the Knoxville Police Department before becoming a private investigator. Mr. Murray testified that one of his assignments while at the city police was in the

6

patrol division, where he served for six years. (Tr. 60 - 61). Mr. Murray testified that he had reviewed the videotape and was familiar with the area in question. Mr. Murray testified that he had made measurements of the distances relevant to the stop of Mr. Jackson's car. (Tr. 61 - 63). Mr. Murray testified that along the portion of the roadway where the videotape shows Officer Brasfield lost sight of the defendant's car, there are some ten residential driveways and three residential streets intersecting Helmbolt Road. (Tr. 65)

## B: ARGUMENT

### I. DEFENDANT JACKSON'S POSITION

#### (a) Traffic Stop

**1.** The defendant first sets forth that Officer Brasfield testified regarding a number of purported traffic violations by Mr. Jackson which supported the traffic stop, but contends that each of them is deficient for the following reasons [Doc. 59]:

*A) No Exterior Mirror*

The defendant asserts that the lack of an exterior mirror is not a traffic violation under the City of Knoxville Code § 17-384 in that it only requires *a* mirror, including an inside mount rearview mirror, and, further, that the videotape shows an outside mirror on the passenger side of the Caprice.

*B) Window Tint Violation*

The defendant argues that Officer Brasfield did not have the proper equipment to check for this alleged violation and that it was not and could not form the basis for the traffic stop.

7

*C) Failing to Signal a Turn*

Mr. Jackson contends that the City of Knoxville Code § 17-183 only requires a turn signal when "the operation of any other vehicle may be affected by such movement," and the proof and Officer Brasfield's testimony confirm there were no other vehicles in the vicinity of the Francis and Helmbolt intersection when the defendant's turn was made, and thus no other vehicles were affected by such movement.

*D) Disregarding a Stop Sign*

The defendant argues that the videotape does not support Officer Brasfield's testimony that the defendant ran the stop sign on Francis Road, and that Officer Brasfield's testimony that he did not know how long the vehicle had been at the stop sign belies his other testimony that he saw the defendant's vehicle disregard the stop sign. The defendant also contends that the stop sign in question is set back from the intersection itself, such that a driver could stop at the stop sign and still travel forward prior to making the left turn.

**2.** The defendant further contends that the evidence did not establish that the vehicle Officer Brasfield saw at the intersection was the vehicle the defendant was driving. The defendant argues that Officer Brasfield was some .2 miles behind the vehicle he saw at the intersection and then, after it turned left, he lost sight of it for some 41 seconds. Further, that there were three intersecting roadways and 10 driveways on Helmbolt Road between the intersection and where he observed the defendant's vehicle. Thus, the defendant argues it was not reasonable to assume the defendant's vehicle was the same one at the intersection, and the only distinguishing characteristic was that both vehicles were a Chevrolet Caprice.

**3.** The defendant further contends that under <u>United States v. Hudson</u>, 405 F.3d 425 (6th Cir. 2005) the evidence obtained in the vehicle search should be suppressed because the purpose of this stop was to investigate for drug activity, not because of a traffic violation.

### (b) <u>Search Incident to Arrest</u>

Mr. Jackson also contends the search in this case was improper as a search incident to his arrest because it was begun before Officer Brasfield received information about the outstanding arrest warrant for the defendant's arrest. The defendant bases this argument on Officer Brasfield's testimony that the search was initiated before he "got the warrant hit back" from police records via radio (Tr. 12) and the videotape, which the defendant asserts "shows" officer Brasfield asking Officer Boatman if he saw anything in the vehicle at time marker 23:56:07, some seven minutes before the return of the information about the outstanding warrant by radio transmission at 00:03:00.

### II. GOVERNMENT'S POSITION

### (a) <u>Traffic Stop</u>

**1.** The government contends the traffic stop was legal because Officer Brasfield had probable cause to believe a traffic violation had occurred.

A) *No Exterior Mirror:* The government does not address this purported violation.

B) *Window Tint Violation:* The government also does not address this issue in its post-hearing brief.

C) *Failure to Signal a Turn:* The government does not address this purported violation.

D) *Disregarding a Stop Sign:* The government contends there is no merit in the defendant's argument that the videotape may not show the defendant traveling through the stop sign without stopping. This is because Officer Brasfield testified he did see the vehicle go through the

9

intersection without stopping for the stop sign. Officer Brasfield explained the perspective of the in-cruiser camera that recorded the videotape was different from his actual line of sight in that as he crested the hill, he could see more than what the camera could see and record. The camera's line of sight is fixed. Further, such a traffic action violates Tenn. Code Ann. § 55-8-149(c) which requires a motorist to stop at a stop sign. The government further argues that even if Officer Brasfield was mistaken as to the facts, the stop was still legal, and justified, as he had probable cause to believe the defendant had committed a traffic violation.

**2.** The government contends that the vehicle Officer Brasfield stopped was the same one he saw run through the stop sign. The government asserts that the car Officer Brasfield initially followed was described by the Officer Blevins (over the radio, from the apartment complex) as a black Caprice with a loud muffler and tinted windows and this car was the only black Caprice seen on the road until Officer Brasfield got directly behind it to make the stop. Further, Officer Brasfield testified that he had no doubt it was the same car. (Tr. 56).

### (b) Search Incident to Arrest

The government argues that the search of the defendant's vehicle was proper because Mr. Jackson's car was searched incident to his lawful arrest. The government contends the defendant was arrested for driving on a suspended or revoked license in violation of state law after he told the officer that his license was suspended. At that time, Mr. Jackson was handcuffed, placed in the back of the cruiser, and, according to Officer Brasfield, placed under arrest for that charge. The government argues that after a lawful custodial arrest, an officer can make a contemporaneous search of the vehicle incident to that arrest. The government argues that Officer Boatman made the

search contemporaneous to the arrest of Mr. Jackson, and incident to his lawful arrest, while Officer Brasfield was writing citations and running a records check.

### C. FINDINGS OF FACT AND CONCLUSIONS OF LAW

#### I. FINDINGS OF FACT

The Court makes the following factual findings. That Officer Brasfield was working with the Community response Team Unit when he followed a car from the Pine Apartments traveling along Francis Road because it was suspected to be associated with an earlier citizen complaint of drug activity at the apartments.

The Court finds that the vehicle Officer Brasfield followed had been described to him as a black Chevrolet Caprice with tinted windows and a loud muffler. Further, Officer Brasfield followed the same vehicle that had been so described on Francis Road. As Officer Brasfield crested the hill in his cruiser, he observed the car at the intersection of Francis and Helmbolt Roads. At that intersection, Officer Brasfield observed the car fail to come to a stop at the stop sign and also fail to signal a left turn.[3]

---

[3] The Court is mindful of the testimony found in the transcript at page 38: [Q:] You saw the vehicle ahead of you there make a left turn at what I presume is the stop sign? [A:] Yes, sir. ...[Q:] Okay, how long had that vehicle been at that stop sign, do you know? [A:] No, sir, I don't know. (Tr. 38). In the Court's view, this did not constitute a statement that the car had stopped The Court credit's Officer Brasfield's repeated testimony that he observed the vehicle prior to the intersection (Tr. 28) and that he saw it go through the intersection without stopping. (tr. 10, 15, 42 and 56) or signaling (Tr. 22, 32, 34-35 and 46). Furthermore, after the Court's own repeated viewing of the videotape, the quality is such (especially as to the reflective light glare from various sources including street lights and signage) that one cannot tell whether the car stopped or ran the stop sign. Further, the Court notes that immediately after Officer Brasfield turned onto Helmbolt in the wake of the defendant's car, he radioed that he was following a car that had run a stop sign and had not signaled a turn. In addition, when the officer stopped the car and approached the driver, he immediately gave the driver those reasons for the stop.

11

The Court concludes that the car Officer Brasfield stopped, driven by the defendant, Damion Jackson, was the same car he had observed run the stop sign and was the same car that he had followed as it left the Pines.[4]

The Court finds that Officer Brasfield stopped the defendant's car only after seeing it fail to come to a stop at the stop sign and fail to signal a left turn.[5]

Further, the Court concludes that the search of the vehicle was conducted after the defendant was arrested for the offense of Driving Without a Valid License in Possession or Driving on a Suspended or Revoked License[6] and after Mr. Jackson was in full custodial arrest following the additional determination that there was an outstanding assault warrant for his arrest.[7] Further, the

---

[4] The Court finds that it was reasonable for Officer Brasfield to believe the Caprice he stopped was the Caprice he observed moments before at the intersection. There is no requirement that a pursuing officer maintain unbroken eye contact with a subject vehicle. It was late at night in a residential area when Officer Brasfield first saw the dark Chevrolet Caprice with tinted windows go past him. The officer fell in behind the car and proceeded to follow it for some distance, losing sight of it as they traveled the curving rise and fall of the roadway. When he saw the dark Chevrolet Caprice with tinted windows again about 41 seconds later, traveling in the same direction on the same road, Officer Brasfield effected a traffic stop. The Court finds that the circumstances within the officer's knowledge were sufficient to warrant a man of reasonable caution to believe that this was the same vehicle. The Court finds, in fact, that it would have been *un*reasonable to conclude that this was some different, coincidental vehicle.

[5] Officer Brasfield realized he could not shine his spotlight into the interior of the car because the window tint was extremely dark, but this was after the Caprice was fully stopped and after the seizure had occurred. (Tr. 11). Although there was testimony that the Caprice's muffler was loud, there was no testimony that it violated the city noise ordinance or other law.

[6] The Court finds the defendant was arrested for a driver license violation when he was handcuffed and placed in the backseat of the patrol car and was not free to leave. (Tr. 19, 53).

[7] Although Officer Brasfield did testify at page 12 that the search of the vehicle where the defendant had been seated, conducted by Officer Boatman, occurred before he got the warrant "hit" back, the videotape indicates otherwise. It shows the warrant "hit" occurred either at time marker 23:59:10 (when there is mention of the assault warrant as described by Officer Brasfield at pp. 11, 12) or at 00:03:46 (when there appears to be confirmation of the outstanding warrant and the officers return to interview of the passenger (c.f., Tr. 21). This is a fact the defendant

12

Court finds that no search occurred at or before the 23:56:07 marker on the videotape when Officer Brasfield asked Officer Boatman if he had seen anything in the car. The Court finds the videotape clearly shows no search was conducted, but that officer Boatman was merely speaking with the passenger of the car as she stood in the door jamb at the front passenger side door. Any "search" would necessarily have been limited to a "plain view" look into the passenger compartment from that perspective, a reasonable distance of a few feet away. The Court also observes that the observation of Officer Boatman at that point is unrelated to the evidence Mr. Jackson seeks to suppress, as Officer Boatman did not see anything and no later search was based on anything Officer Boatman did.

## II. Conclusions of Law

### (a) Traffic Stop

The stop of an automobile and the detention of its occupants constitutes a seizure within the meaning of the Fourth Amendment, even if the purpose of the stop is limited and the detention is brief. Whren v. United States, 517 U.S. 806, 809-10 (1996); Delaware v. Prouse, 440 U.S. 648, 663 (1979); United States v. Martinez-Fuerte, 428 U.S. 543, 556-58 (1976). Finding that Mr. Jackson was seized, calling into operation the protections of the Fourth Amendment, the Court must next determine whether that seizure was reasonable.

A search or seizure conducted without a warrant is presumed unreasonable. Coolidge v. New Hampshire, 403 U.S. 443, 454-55 (1971). Therefore, evidence seized as a result of a search or seizure conducted without a warrant must be suppressed unless the government proves by a preponderance of the evidence that the search was reasonable. Id.bbGenerally, for the seizure of an

---

evidently concedes in his post-hearing brief. [Doc. 59 at 9]. Further, Officer Brasfield's other testimony confirms that no search occurred prior to that time (Tr. 20-22, 49, 50 and 52)

automobile and occupants to be reasonable, there must be some type of individualized suspicion of wrongdoing justifying the seizure. It has been deemed reasonable to seize an automobile and its occupants if an officer has probable cause to believe that a criminal offense has occurred or that a traffic violation has occurred. See Whren, 517 U.S. at 810; Prouse 440 U.S. at 655, 659. If the officer has probable cause to believe that a violation of the traffic code has occurred, the seizure will be upheld even if it is a complete pretext for the officer's subjective motivations in making the stop. Whren, 517 U.S. at 813-17. Similarly, it has been deemed reasonable to temporarily seize an automobile and occupants for investigation in the absence of probable cause if a police officer has reasonable suspicion, based on specific and articulable facts, that the occupants have been involved in or are about to be involved in criminal activity. See Ornelas v. United States, 517 U.S. 690, 693 (1996); Terry v. Ohio, 392 U.S. 1, 30 (1968).

The Court agrees with Mr. Jackson's arguments as set forth herein at § 1 A) with respect to the exterior mirror, at § 1 B) pertaining to a window tint violation and at § 1 C) regarding the turn signal issue. The Court notes the government's apparent concession of these issues by omission from its post-hearing brief. The turn signal failure observed by Officer Brasfield is governed by Tennessee Code Annotated section 55-8-143(a), which states:

> Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that such movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal required in this section, plainly visible to the driver of such other vehicle of the intention to make such movement.

Likewise, section 55-8-142(a) states that no one shall:

> turn a vehicle from a direct course or move right or left upon a roadway, unless and until such movement can be made with reasonable safety. No person shall so turn any vehicle without giving

14

> an appropriate signal in the manner provided in §§ 55-8-143 and 55-8-144 in the event any other traffic may be affected by such movement.

The City of Knoxville Municipal Code similarly provides, at section 17-183:

> (a) Every driver who intends to start, stop or turn, or partly turn from a direct line, shall first see that such movement can be made in safety, and whenever the operation of any other vehicle may be affected by such movement, shall give a signal as required in this section, plainly visible to the driver of such other vehicle, of his intention to make such movement

Mr. Jackson correctly states the law in that a failure to signal the turn, under these circumstances, does not constitute a traffic violation because the failure to signal did not affect other traffic. Further, the stop in question cannot be based upon a mistaken belief in law on the part of the officer because a mistake regarding the applicable law cannot provide the objectively reasonable grounds for providing reasonable suspicion or probable cause. See United States v McDonald, 453 F 3d 958 (7th Cir. 2006) (which held that a stop based on a subjective belief that a law has been broken, when no violation actually occurred, is not objectively reasonable) as cited in defendant's brief [Doc. 59].

The Tennessee Court of Criminal Appeals has interpreted these statutes as not requiring a person to signal a turn unless it would affect other drivers. State v. Gonzalez, 52 S.W.3d 90, 99 (Tenn. Crim. App. 2000) (driver's failure to signal right turn did not give police officer probable cause to stop vehicle, as there was no other traffic that might have been affected by turn, and thus driver did not violate traffic code by failing to signal.) If other motorists could have been affected by Mr. Jackson's turn, then he was required by State law to activate his turn signal. See id. The testimony at the hearing was that no other traffic was on the roadway at the time Mr. Jackson turned, and that no other traffic was affected by his turn. (Tr. 56) Mr. Jackson's failure to use his turn

15

signal under these circumstances did not constitute a traffic violation and could not form the basis for the stop.

The Court disagrees with the defendant's argument at § 1 D) as to disregard of the stop sign and finds that there was probable cause to stop Mr. Jackson for the traffic violation of running the stop sign. The Court has concluded in its findings of fact (supra § C I) that Officer Brasfield did observe the defendant pass through the intersection without stopping for the stop sign.

The second traffic event cited by Officer Brasfield was that Mr. Jackson failed to come to a complete stop when he turned left from Humbolt onto Francis. The relevant provision of the Tennessee Code states:

> (c) Every driver of a vehicle and every operator of a streetcar approaching a stop sign shall stop before entering the crosswalk on the near side of the intersection, or in the event there is no crosswalk, shall stop at a clearly marked stop line, but if none, then at the point nearest the intersecting roadway where the driver or operator has a view of approaching traffic on the intersecting roadway before entering the intersection, except when directed to proceed by a police officer or traffic control signal.
> Tenn. Code Ann. § 55-8-149(c).

The Court has found that Officer Brasfield was in a position to view the Caprice at the intersection. (supra at § C I).

In United States v. Sanford, 476 F.3d 391, 396 (6th Cir. 2007), the Sixth Circuit directed that the "relevant inquiry is whether the police officer possessed probable cause or reasonable suspicion to believe that a traffic violation occurred, not whether a traffic violation occurred." To hold otherwise would raise the standard for a traffic stop to an absolute certainty, or beyond a reasonable doubt, rather than probable cause. The Court believes the holding in Sanford controls this issue. In Sanford, police officer Pruitt likewise stopped a defendant's car for a violation of the rules of the road, specifically that he was following too closely in violation of Tennessee Code Annotated § 55-

8-124. The Sixth Circuit observed, "[t]he crux of this case is a question of law-whether Pruitt had probable cause or reasonable suspicion to believe that Tenn. Code Ann. § 55-8-124 was violated when defendants' vehicle was momentarily following another vehicle within a distance of ten feet while traveling 65 miles-per-hour and a third vehicle was passing in the passing lane. Pruitt's ulterior motivations, if any, are irrelevant." Sanford, 476 F.3d at 395. The court went on to address whether the defendant was in fact violating the state code when the officer observed him. This Court finds that Officer Brasfield "possessed probable cause or reasonable suspicion to believe that a traffic violation occurred." United States v. Westmoreland, 2007 WL930262 (6th Cir., Mar. 29, 2007) (quoting United States v. Sanford, 476 F.3d 391, 396 (6th Cir. 2007)).

The Court finds this was a valid traffic stop based upon Officer Brasfield's observation that the defendant's vehicle disregarded the stop sign on Francis Road at Helmbolt.

### (b) Search Incident to Arrest

The Court finds that after the valid traffic stop was completed, the search of the vehicle was a lawful search incident to Mr. Jackson's arrest for Driving on a Suspended, Revoked or Cancelled Licence. Mr. Jackson was handcuffed and placed in the backseat of the cruiser in direct response on the defendant's statement that he did not have a driver license to present to the officer because his license was suspended. Having found that the search was conducted after Mr. Jackson's continued custodial arrest for the outstanding warrant (supra § C I), the Court concludes this was

a valid search incident to that arrest.[8] New York v. Belton, 453 U.S. 454, 460 (1981); c.f., Thornton v. United States, 541 U.S. 615, 619 (2004).

### III: CONCLUSION

For the reasons stated herein, the Court's recommendation is that Damion Bradley Jackson's Motion to Suppress **[Doc. 44]**, be **DENIED**.[9]

Respectfully submitted,

    s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[8] The Court finds the holding in United States v. Hudson, 405 F.3d 425 (6th Cir. 2005) inapposite in light of the facts of this case. In Hudson, the arrest of the defendant on outstanding warrants was "achieved, but only by exploiting a stop unsupported by reasonable suspicion." Hudson, 405 F.3d at 440.

[9] Any objections to this report and recommendation must be served and filed within ten (10) days after service of a copy of this recommended disposition on the objecting party. Fed. R. Crim. P. 59(b)(2). Failure to file objections within the time specified waives the right to review by the District Court. Fed. R. Crim. P. 59(b)(2); see also Thomas v. Arn, 474 U.S. 140 (1985) (providing that failure to file objections in compliance with the ten-day time period waives the right to appeal the District Court's order). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).